Jeffrey I. Carton, Esq. (JC8296)
Amber T. Wallace, Esq. (AW6592)
DENLEA & CARTON, LLP
2 Westchester Park Drive, Suite 410
White Plains, New York 10604
jcarton@denleacarton.com
awallace@denleacarton.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
TECMAC INC. d/b/a MILLER'S SERVICE
STATION and EDWARD C. MILLER,          :   CASE NO. 20-CV-3386

                     Plaintiffs,   :   **COMPLAINT**

v.                                     :   JURY TRIAL DEMANDED

SEI FUEL SERVICES, INC.,               :

                     Defendant.    :
------------------------------------------------------------ X

Plaintiffs, Tecmac, Inc. d/b/a Miller's Service Station and Edward C. Miller, by and through their attorneys, Denlea & Carton LLP, respectfully file this Complaint and allege as follows:

## NATURE OF THE ACTION

1. This action seeks to redress: (i) Defendant SEI Fuel Services, Inc.'s ("SEIF") stubborn refusal to acknowledge the plain and unambiguous terms of a written agreement for the supply of fuel, the termination of which Plaintiff has properly exercised, and (ii) Defendant's unlawful retention of monies owed to Plaintiff in a blatant and transparent attempt to strong-arm Plaintiff into accepting Defendant's ill-informed and erroneous interpretation of that agreement.

Because Defendant has turned a blind eye and a deaf ear to the actual and unmistakable language memorialized in the parties' supply agreement, Plaintiff is compelled to bring this action.

2. As set forth more fully below, in 2012, Plaintiffs entered into a written agreement for the supply of branded gasoline and fuel products for Plaintiff's retail gas station from SEIF's predecessor-in-interest (Apache Oil Co., Inc.), a fuel supplier. The agreement set forth the term of the supply agreement to be eight years **or** the purchase of seven-and-a-half million gallons of gasoline, whichever occurred first. Near the conclusion of the eight-year term of the supply agreement, as a result of poor service and a lack of communication from SEIF, Plaintiffs decided not to renew the supply agreement and to terminate the parties' agreement at the conclusion of the initial eight-year term.

3. Although SEIF had previously acknowledged and accepted Plaintiffs' timely termination, SEIF subsequently and inexplicably reversed course, and insisted that Plaintiffs somehow could not terminate the agreement until after they had purchased all seven-and-a-half million gallons of gasoline, and demanded that Plaintiffs continue to purchase gasoline from SEIF for several additional years, or pay SEIF more than one million dollars for SEIF's purported "lost profits."

4. Accordingly, Plaintiffs bring this action seeking: (i) a declaratory judgment holding SEIF to the terms of the written agreement, and declaring the agreement properly terminated at the conclusion of its eight-year term, and (ii) to recover the funds SEIF has been improperly withholding from Plaintiff in a gross and wanton disregard of Plaintiffs' rights.

**PARTIES**

5. TECMAC Inc. d/b/a Miller's Service Station is a domestic business corporation with a principal place of business at 7 Bracken Road, Ossining, New York 10562. TECMAC Inc. operates a retail gas station located at 26 Campwoods Road, Ossining, New York 10562.

6. Edward C. Miller is a natural person of full age of majority, domiciled and residing in Westchester County, New York.

7. Upon information and belief, Defendant SEI Fuel Services, Inc. is a foreign business corporation with a principal executive office located at 4265 San Felipe, #1100, Houston, Texas 77027.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction pursuant to 28 U.S. C. § 1332 based on the diversity of the citizenship of the parties and because the amount in controversy, excluding interest and costs, exceeds $75,000.

9. Venue in this District is proper pursuant to 28 U.S.C. § 1391 inasmuch as a substantial part of the events or omissions giving rise to the claims occurred in this District and the defendant is authorized to conduct business in this District.

**FACTS**

**A.    The Station**

10. Miller's Service Station is a retail gas station located at 26 Campwoods Road, Ossining, New York, 10562 (the "Station"). Mr. Miller purchased the Station in 1991 to operate as a family-run business, and worked tirelessly to modernize and update the Station. When purchased, the Station was branded as a Mobil gas station. In addition to the sale of gasoline and

fuel products, the Station also provides car maintenance services, annual car inspections, and sells sundry goods from an on-site convenience store.

11. Like many retail gas stations, throughout its history of operation, the Station has purchased gasoline and motor fuel from fuel suppliers for numerous brands of gasoline. When purchasing branded gasoline and fuel products to sell to consumers, the Station is not permitted to purchase or sell any other brand of fuel (including unbranded fuel), and the Station itself is physically altered to match the branded fuel, included new signs, canopies, and promotional materials.

12. Over the course of nearly 30 years of operation, the Station has always set itself apart from other local retail gas stations through its provision of excellent customer service, quality gasoline and fuel products, immaculate facilities, and central location. In recognition for his outstanding business acumen and skilled management of the Station, Mr. Miller has been invited to serve on both state-wide and nation-wide committees to advise national fuel suppliers on retail gas station business concerns and innovations.

**B.      The Agreements with Apache**

13. In or about 2003, the Station entered into a Branded Open Dealer Agreement (the "2003 Agreement") with Apache Oil Company, Inc. ("Apache"), a retail fuel supplier.

14. The 2003 Agreement had a term of eight years, and the Station was obligated to purchase a minimum of six million gallons of gasoline from Apache. The Station dutifully performed all of its duties and obligations throughout the term of the 2003 Agreement, as did Apache.

15. In early 2012, after the 2003 Agreement had expired, Mr. Miller met with a representative of Apache to discuss the terms of a new supply agreement for the Station. Unlike

the prior 2003 Agreement, a critical term for Mr. Miller in entering into a new supply agreement was that the length of the contract be for a certain amount of years **or** the purchase of a certain amount of gasoline, whichever occurred first.  This would provide the Station – and Mr. Miller – with more flexibility to exit the supply agreement if demand for gasoline increased and a fixed amount of gasoline was sold prior to the passage of a defined period of time.

16. During this 2012 meeting, Apache and Mr. Miller agreed upon the key terms of a new supply agreement for the Station, pursuant to which the Station would sell Gulf Oil branded gasoline and motor fuel and would be branded as a Gulf retail gas station.  The parties agreed that the initial term of the supply agreement would be eight (8) years **or** 7,500,000 gallons, whichever occurred first.  After the conclusion of the term of the agreement – *i.e.*, after eight years or the purchase of 7,500,000 gallons – the agreement could be renewed from year to year.

17. Following this discussion wherein the parties agreed to the material terms of their anticipated future relationship, Apache memorialized these agreed-upon terms in a letter of intent dated February 1, 2012 (the "Letter of Intent"), which Apache sent to Mr. Miller.  The Letter of Intent reflected the parties' mutual understanding that the length of contract would be "8 years OR 7,500,000 gallons, whichever comes first."  Indeed, the disjunctive use of the word "or" was capitalized in the Letter of Intent to reflect the importance of the parties' understanding and their agreement regarding the term of the agreement.  An Apache representative signed the Letter of Intent upon delivery to Mr. Miller, and Mr. Miller signed the Letter of Intent as "Accepted."

18. Immediately thereafter, Apache and the Station entered into a formal Branded Open Dealer Agreement, dated as of February 1, 2012 (the "Supply Agreement").  This document was drafted by Apache.  Mr. Miller signed the Agreement on behalf of the Station.

19.     The Supply Agreement does not include a merger or integration clause, and was not intended to change, or replace, the material terms reflected in the Letter of Intent.  Rather, the Supply Agreement only provides more details concerning the mechanics of the supply agreement, as well as to include mandatory regulatory language required under federal law.

20.     In conformity with the Letter of Intent, the Supply Agreement states that "[t]his Agreement shall have an initial term of Eight (8) years from the 1st of February, 2012 until the 31st day of January, 2020 OR until [the Station] has purchased seven million five hundred (7,500,000) gallons of gasoline from Apache hereunder[.]"  (Supply Agreement ¶ 14.)  Once again, the disjunctive use of the word "or" was capitalized to emphasize that the term of the agreement would expire at the completion of either of two, independent events: the passage of eight years, or the purchase of 7.5 million gallons of gasoline, whichever occurred first.

21.     The Supply Agreement also provides that the Station could cancel the contract "upon ninety (90) days written notice."  (Supply Agreement ¶ 14.)  Cancellation was not tied to any minimum purchase of gasoline or fuel products, but rather could take place at any time during, or after, the initial eight-year term.

22.     Apache, Mr. Miller, and the Station also entered into a Loan Agreement dated as of February 1, 2012 (the "Loan Agreement").  This document was prepared using a form agreement drafted by Apache.  Mr. Miller signed the Loan Agreement on behalf of the Station and himself as an individual.

23.     Pursuant to the terms of the Loan Agreement, Apache advanced a $75,000 loan (the "Loan") to Mr. Miller and the Station, collectively, in three installments of $25,000 over the course of 2012.

24.     The Loan Agreement provides that the Loan was to be repaid to Apache through a one cent ($0.01) credit for each gallon of gasoline that the Station purchased from Apache. (Loan Agreement ¶ 2(a).)  It was contemplated that the $75,000 loan would be repaid in full upon the purchase of 7,500,000 gallons of gasoline (*i.e.*, $0.01 x 7,500,000 gallons.)  The Loan Agreement provides that "[n]o interest shall accrue on the Loan balance." (*Id.*)

25.     The Supply Agreement confirms that Apache would credit one cent ($0.01) for each gallon of gasoline purchased by the Station against the outstanding balance due to Apache under the Loan Agreement.  (Supply Agreement ¶ 2.)

26.     Recognizing, however, that the Supply Agreement could terminate prior to the purchase of 7,500,000 gallons (*i.e.*, after 8 years), the Loan Agreement provides that "[i]f at the end of the term of the Supply Agreement, any portion of the Loan remains unpaid, [Mr. Miller and the Station] shall immediately pay to Apache the entire unpaid Loan balance." (Loan Agreement ¶ 2(b).)

27.     Unlike the Supply Agreement, the Loan Agreement does contain a merger and integration clause, confirming that "[t]he Loan Documents constitute the entire agreement between [Mr. Miller and the Station] and Apache with regard to the Loan, and supersede any and all prior written and oral agreements, commitments, or undertakings with respect thereto." (Loan Agreement ¶ 8(a).)

28.     The Supply Agreement inadvertently includes the form language – identical to the form language contained in the 2003 Agreement and every other form supply agreement prepared by Apache – that the Station "agrees to purchase a minimum of seven million five hundred thousand (7,500,000) gallons of gasoline" without reference to the eight-year initial term. (Supply Agreement ¶ 2.)  This language was not intended to change the substantive terms

of the Letter of Intent, nor was it intended to extend the initial term beyond eight years. Instead, this language was included only in reference to the repayment of the Loan, which, at $75,000, was contemplated to be repaid exclusively through the one cent ($0.01) credit on each gallon of gasoline the Station purchased from Apache.

29. The parties also agreed that all customer credit card sales – whether for gasoline, fuel, car services, or goods sold at the convenience store – would be processed through an external credit card processing system under the control of Apache, and then remitted in whole to the Station. This saved the Station the expense of having to contract for a credit card processing system of its own, and also ensured that Gulf could process credit card payments in accordance with its own internal credit card processing protocols.

C. **The Station Diligently Performs All Duties Under the Agreements**

30. Upon signing the Letter of Intent, the Supply Agreement, and the Loan Agreement (together, the "Agreements"), the Station began purchasing Gulf gasoline and fuel products from Apache.

31. Additionally, the Station rebranded itself from an Exxon retail gas station to a Gulf retail gas station, including new signage, canopies, and exterior paint. The rebranding was completed in coordination with Apache.

32. Between 2012 and 2019, the Station purchased more than four (4) million gallons of Gulf gasoline. In accordance with the terms of the Supply Agreement, the Station exclusively purchased gasoline from Apache and, as detailed further below, its corporate successor in interest, during the term of the Supply Agreement.

33.     Throughout the duration of the Supply Agreement, neither the Station nor Mr. Miller were informed of any issues or deficiencies in their performance under the Supply Agreement.

**D.     The Station Properly Terminates the Supply Agreement**

34.     Upon information and belief, on or about June 25, 2019, Apache sold its petroleum marketing and retail fuels distribution business to SEI Fuel Services, Inc. ("SEIF"), which is a subsidiary of 7-Eleven, Inc.  As part of this sale, SEIF was assigned all of Apache's rights and obligations under the Agreements.

35.     In late 2019, as the Supply Agreement's initial eight-year term was coming to an end, Mr. Miller reached out to SEIF about the possibility of renewing the Supply Agreement for the Station.  SEIF promised Mr. Miller that it would provide Mr. Miller with a written proposal regarding potential terms for a renewed Supply Agreement.  However, SEIF never prepared any written proposal for Mr. Miller, and did not return his calls.  Mr. Miller later learned that his SEIF representative was no longer employed by SEIF, yet SEIF had not informed Mr. Miller of this fact, nor did SEIF provide Mr. Miller with contact information for a new SEIF representative.

36.     On his own initiative, and without any assistance from SEIF, Mr. Miller finally learned who his new SEIF representative was.  However, after SEIF's lack of communication and seeming disinterest in continuing to conduct business with the Station, Mr. Miller decided to terminate the Supply Agreement at the end of its eight-year term on January 31, 2020, and enter into a new supply agreement with a new fuel supplier.

37.     On or about November 12, 2019, Mr. Miller informed SEIF of his intent to terminate, and was told, in an email sent by an SEIF representative, to "hold off" on providing

his termination notice so that SEIF could calculate any outstanding amount under the Loan Agreement.  SEIF did not object to Mr. Miller's termination of the Supply Agreement, nor did SEIF demand that the Station purchase additional gasoline prior to termination.

38.    On November 14, 2019, Mr. Miller received another email from SEIF, again acknowledging Mr. Miller's decision to terminate the Supply Agreement and reiterating that a "more accurate number [for the loan]" would be provided to him "as we get closer to you leaving."  Once again, SEIF did not object to Mr. Miller's termination of the Supply Agreement, nor did SEIF demand that the Station purchase additional gasoline prior to termination.

39.    By letter dated November 14, 2019, Mr. Miller sent SEIF a formal, written notice of termination, reaffirming that he would not be renewing the Supply Agreement.  In his letter, Mr. Miller reiterated that SEIF had already acknowledged his termination, and that he was directed to send his termination letter to SEIF "now."  Mr. Miller stated that the termination would be effective as of January 31, 2020.

40.    In his November 14, 2019 termination letter, Mr. Miller acknowledged that there may be some amount of money owed on the Loan, which the Station was prepared to pay at the conclusion of the term of the Supply Agreement, and that SEIF had represented to him that it would calculate the total amount owed on the Loan as the "final settlement" of the parties' relationship.

41.    SEIF did not contact Mr. Miller about the "final settlement" of the Loan, although he remained ready, willing, and able to repay any amount outstanding.

42.    Thereafter, the Station entered into a new retail fuel supply agreement with a new fuel supplier, to commence on February 1, 2020.  The Station also dutifully removed all Gulf

branding from the Station so as to ensure that customers would not be confused as to whether the Station was still selling Gulf branded gasoline, or operating as a Gulf retail gas station.

43. On January 31, 2020, the Supply Agreement with SEIF terminated, and the Station began operating pursuant to a new supply agreement with a new fuel supplier.

### E. SEIF Refuses to Acknowledge Termination and Impermissibly Withholds Credit Card Fees Due and Owing to the Station

44. By letter dated February 10, 2020, three months after Mr. Miller's notice of termination and over a week after the Supply Agreement terminated, SEIF informed Mr. Miller for the first time that the Supply Agreement was not terminated, and that the Station was obligated to purchase over three million additional gallons of Gulf-branded gasoline or pay SEIF over one million dollars for purported "lost profits" on the unpurchased gasoline.

45. SEIF also, in violation of the parties' agreement, began impermissibly withholding funds due and owing to the Station from customer credit card purchases. These credit card purchases were not only for purchases of SEIF fuel, but included purchases of the new supplier's fuel, car maintenance services, annual car inspections, and goods from the on-site convenience store. Between January 30, 2020 and March 3, 2020, SEIF withheld at least $80,089.10 of the Station's funds. SEIF has refused to remit any of the Station's monies.

46. Since the termination of the Supply Agreement, SEIF has continuously demanded that the Station enter into a new supply agreement for the purchase of gasoline and fuel exclusively from SEIF, and is withholding the Station's credit card purchase monies until the Station submits to a new supply agreement on SEIF's terms.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment)**

47. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

48. The Supply Agreement are valid, binding, and enforceable contracts.

49. The Letter of Intent provides that the "[l]ength of contract 8 years OR 7,500,000 gallons, whichever comes first."

50. Additionally, Section 14 of the Supply Agreement provides that "[t]his Agreement shall have an initial term of Eight (8) years from the 1st of February, 2012 until the 31st day of January, 2020 OR until [the Station] has purchased seven million five hundred (7,500,000) gallons of gasoline from Apache hereunder[.]"

51. Pursuant to the parties' written agreement, and Plaintiffs' written notice to Defendant, the Supply Agreement terminated after the expiration of eight years.

52. Despite prior written acknowledgment of Plaintiffs' termination of the Supply Agreement, SEIF has subsequently refused to accept Plaintiffs' termination of the Supply Agreement, and is demanding that Plaintiffs continue to purchase over three million gallons of fuel exclusively from SEIF or pay SEIF over one million dollars for purported "lost profits" on the unpurchased gasoline.

53. By reason of the foregoing, a present, ripe, and justiciable controversy exists between Plaintiffs and SEIF.

54. Plaintiffs therefore seek a declaratory judgment that the Supply Agreement is terminated, that Plaintiffs are not obligated to purchase any additional fuel from SEIF under the Supply Agreement, and that SEIF is not entitled to collect any payment, including but not limited to lost profits, for gasoline that was not purchased by the Station prior to the termination of the Supply Agreement.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

55.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

56.     The Letter of Intent, the Supply Agreement, and the Loan Agreement are valid, binding, and enforceable contracts.  Additionally, the parties entered into a valid, binding, and enforceable agreement concerning the remittance of credit card payments from the Station's customers to the Station.

57.     Plaintiffs have performed all of their obligations in connection with the Letter of Intent, the Supply Agreement, the Loan Agreement, and the credit card payment agreement.

58.     Plaintiffs have made demand for payment of the outstanding credit card payments due and owing to the Station.

59.     SEIF has breached its contractual obligations to Plaintiffs under the parties' agreements, including its obligation to pay the Station the outstanding credit card payments.

60.     As a result of SEIF's breaches of its contractual obligations to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

61.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

62.     Plaintiffs have a direct relationship with SEIF.

63.     SEIF benefitted and continues to benefit at Plaintiffs' expense from Plaintiffs' services and sale of goods at the Station.

64.     Plaintiffs have not been compensated for the services and goods it provides at the Station.

65. Equity and good conscience require that SEIF not be permitted to retain the benefit at Plaintiff's expense, and that Plaintiffs receive restitution for their services and goods provided at the Station.

66. By reason of the foregoing, SEIF is liable to Plaintiffs for restitution in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Money Had and Received)**

67. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

68. SEIF received monies belonging to Plaintiffs, including credit card fees from purchases customers made at the Station.

69. SEIF has benefitted from the receipt of the Station's credit card fees.

70. Equity and good conscience require that SEIF not be permitted to retain these monies, and that Plaintiffs receive restitution for the credit card fees impermissibly held by SEIF.

71. By reason of the foregoing, SEIF is liable to Plaintiffs for restitution in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment and relief against Defendants as follows:

   i. declare that the Supply Agreement is terminated;

   ii. declare that Plaintiffs are not obligated to purchase any additional fuel from SEIF under the Supply Agreement;

   iii. declare that SEIF is not entitled to collect any payment, including but not limited to lost profits, for gasoline that was not purchased by the Station prior to the termination of the Supply Agreement;

   iv. compensatory damages in an amount to be determined at trial;

    v.    the costs and disbursements of this action, including attorney's fees;

    vi.    pre- and post-judgment interest at the highest rate(s) provided by law; and

    vii.    such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs respectfully request a trial by jury as to all claims in this action.

Dated: April 30, 2020
       White Plains, New York

                              **DENLEA & CARTON LLP**

                              */s/ Amber Wallace*
                              _____
                              Jeffrey I. Carton
                              Amber T. Wallace
                              2 Westchester Park Drive, Suite 410
                              White Plains, New York 10604
                              Telephone:  (914) 331-0100
                              Facsimile:   (914) 331-0105

                              *Attorneys for Plaintiffs*